MYERS & GALIARDO, LLP
ATTORNEYS AT LAW
CHANIN BUILDING
122 EAST 42ND STREET, SUITE 2710
NEW YORK, NY 10168

TELEPHONE
(212) 986-5900

FACSIMILE
(212) 986-6250

October 12, 2007

Hon. Kenneth M. Karas
United States District Court
Southern District of New York
300 Quarropas Street
White Plains, NY 10601

**RE: USA v. Carroll (7:07-cr-904)**

Judge Karas:

As you will recall, this Office represents Mr. Peter Carroll in the above matter. On October 1, 2007, the parties convened for what was anticipated to be the entry of a guilty plea to Title 18 S.2252A (a) (5) (B). **Certain activities relating to material constituting or containing child pornography.** All parties conceded that the offense is categorized as a "violent offense" as outlined in Chapter 100. It follows that a defendant be necessarily detained pursuant to 18 S. 3143. This Office argued that Mr. Carroll fell within the "exceptional circumstance" provisions of 18 S. 3145(c) when it is clearly shown that there are exceptional reasons why detention would not be appropriate. The Court asked both parties to submit supporting case law and/or arguments on the issue.

As a matter of procedure cases under 3142(f) require an affirmative motion by the Government to request remand. No formal request has been made by the Government to date and thus a plea can technically be accepted by the Court without Section 3143 being applied.

Title 18 S.3145(c) recognizes that there are "exceptional circumstances" under which a defendant qualifies to be at liberty pending his/her sentencing. The test under 3145 (c) is necessarily a flexible one, and district courts have wide latitude to determine whether a particular set of circumstances qualifies as exceptional. The accompanying case law clearly demonstrates that the present circumstances support this exception.

What exactly qualifies under the exceptional circumstances provision depends upon a case by case analysis of the unique facts and circumstances that each defendant presents. United States v. DiSomma, 951 F 2d 494, 496 (2d Cir. 1991). A wide range of factors that a court can consider include: (1) the nature of the defendant's conduct; (2) the defendant's prior record; (3) the length of the prospective prison sentence if any (4) circumstances that may render the hardships of prison unusually harsh, such as illness or injury; (5) the likelihood of success on appeal; and (6) whether the defendant was unusually cooperative with the government.

We will address the general criteria outlined in DiSomma in seriatim: (1) the conduct of Mr. Carroll occurred solely in the privacy of his home. His alleged conduct can only be understood in light of the trauma Mr. Carroll endured as a sexually abused young adult. Mr. Carroll is not alleged to have acted out in any fashion toward minors either by stalking, talking, blogging, or any other affirmative actions or means of communication with a minor which could be construed as acting out on his possession of child pornography, moreover; although chapter 100 categorizes the offense as technically violent Mr. Carroll poses no danger to the community or risk of flight. In point of fact, his condition of cerebral palsy severely limits his mobility. (2) the defendant has no criminal history (3) the length of the prison sentence post United States v. Booker 131 Fed. Appx. 234 is within the discretion of the court. Theoretically, this Court could sentence Mr. Carroll to a non-incarceratory sentence with psychiatric counseling. The legislative history and cases pre-Booker reflect circumstances where defendants simply had to begin their prison terms. It is logical to conclude that a defendant who has lost a trial or entered a plea prior to Booker was an obvious risk of flight and therefore, the remand provision of Section 3143 was instituted to assure the defendant return for sentencing when he/she clearly faced incarceration (4) a circumstance which may render imprisonment unduly harsh is Mr. Carroll's well documented illness of cerebral palsy. Additionally, Mr. Carroll suffers from extreme low self-esteem as a result of being abused as a teenager at a summer camp. Simply put, prisons are warehouses not rehabilitation centers. Mr. Carroll's illnesses; both mental and physical, would never be properly administered to while in prison. Prisons are ill-equipped to handle a defendant like Mr. Carroll, who, it could be argued, suffers from an illness rather than a criminal mindset. As such, imprisonment would be cruel and unusual. (5) the likelihood of success on appeal does not apply at this time. (6) while the defendant may not qualify as a "cooperator" it should be noted that Mr. Carroll did meet with Homeland Security Agents and a United States Attorney in an attempt to assist in providing information about several runaway children. He was also entirely cooperative and forthright about his conduct concerning his acceptance of responsibility and timeliness of his plea via Pimentel prior to the remand issue arising. This fact is exceptional in light of the fact that the Court is attempting to gauge whether or not Mr. Carroll would return to court

should he plead guilty. One would be hard- pressed to believe that a person who has been forthright with prosecuting officials would then abscond after a plea. Additional factors the Court may consider; Mr. Carroll worked at PACE University for 22 years. By all accounts he was an outstanding employee (corroboration will be provided in the P.S.R. and the defendant's pre-sentencing memo). Mr. Carroll has an extremely supportive family. All family members have led law-abiding lives. Finally, as part of Mr. Carroll's bail conditions he is on home confinement and wears an ankle bracelet at all times, and has been fully compliant.

Additionally, Booker was clearly not contemplated by the remand provisions of 18 S. 3145. In giving the Court more latitude to depart from the guidelines; Judges may sentence defendant's facing (formerly) mandatory incarceration to non-incarceratory sentences. It follows that the Court is at liberty to not only depart from the guidelines but find exceptional circumstances in cases where the Court may preliminarily (before sentencing) determine that the appropriate sentence is non-incarceratory. There would be no logical reason to remand a defendant under 18 S. 3145 who may ultimately be sentenced to probation and counseling.

We ask this Court to consider not accepting the plea at this time. Typically, a Court may reject the acceptance of an offered plea because the Court sees the plea as unusually lenient or harsh. Since the Court truly has discretion, we are asking the Court to consider granting an adjournment of the plea for a period to prepare a pre-pleading memorandum. We ask that all the facts be at the Court's disposal before the Court remands an individual who may be considered for probation, registration , and psychiatric counseling. It appears nothing legally prevents this Court from granting this request.

While it is up to Your Honor to determine whether exceptional circumstances exist which warrant an exception to S. 3145, this Office will state with confidence that an exceptional client stands before this Court. We wish that You consider the attached letters from the defendant's father, Michael E. Carroll, and the defendant's girlfriend Janet Kirtman.

Respectfully Submitted,

M. Myers

Matthew D. Myers

Encl: Letters of Recommendation (2)

To whom it may concern:

Ref: Peter J. Carroll

From: Michael E. Carroll

As Peter's father, I believe I have a unique perspective to offer on Peter, his background, development, family relationships, and character.

Peter started life with a couple of handicaps. The first was a diagnosis of mild cerebral palsy which showed up as deformed legs which made it difficult for him to walk. He underwent a series of painful operations, that involved breaking of his leg bones to reposition them and the insertion of steel pins to hold them in place. These pins can set off metal detectors, a constant source of embarassment. The final operation required Peter to be immobilized in a body cast from waist to toes for six months. Throughout this whole ordeal, through extremely frustrated at times, Peter never became bitter or depressed and somehow managed to maintain the great sense of humor he still has today. These operations were not totally successful however and Peter still suffers from a severe toe-in on his right leg which effects his balance and results in an unusual gait when he walks. Kids at school taunted him at times for being "different" which did not help his self-esteem.

Peter's second problem was a learning disability which showed up as soon as he started school. It was a perceptual handicap which involved spacial disorientation, similar to dyslexia but more complex. Peter was enrolled in a special school at Newington Childrens Hospital for a period of four years. His class had two teachers and only four students. He had to endure numerous repetitive drills in order to essentially rewire his brain. These drills were also carried out at home by his mother on weekends and during school vacations so that he did not backslide in the progress he was making. This was a very challenging and at times, frustrating time, for Peter but he hung in there and overcame his handicap such that he was mainstreamed into the public school system by fifth grade. When Peter reentered the public school system, we had moved and so he started from scratch in building new friendships which he easily did, and the remainder of his school days were normal in all respects. He had a group of four close friends who hung out together, dated together and did the usual teenage guy things. Peter even befriended a retarded boy who lived down the street and brought him into many of his group's activities.

During high school, Peter was not an athlete, but he did participate in many activities like the Drama Club and the Simsbury Summer Theatre for Youth. It was there he developed his interest in multimedia. He video-taped the high school footbal team's practices and games for the coach and also helped develop some of the early computer programs on an original Apple computer for the school. This interest carried over into his college years at Pace University where he was a student assistant in the multimedia organization. This led to a permanent position in the same organization at Pace when he graduated, the beginnings of the job he held until his arrest led to his termination.

I have been told that Peter was very good at designing various systems for The University. I must admit that I don't fully understand all he tells me about what he does, but I can't miss the enthusiasm he shows. He is a very conscientious worker. He just loved his job. He is just devastated that he was let go by Pace. His job and Pace were such a big part of his life. He is having great difficulty coping with this loss after 24 years of dedicated service.

Now to family relationships: Peter is the middle child of five. He has an older sister and brother and two younger sisters. All fairly close together, within an eight year span. We have always been a very close-knit family. Peter, his brother, and his two younger sisters all attended Pace University together along with two cousins. His grandfather was a Pace Vice-President and Dean of Pace Westchester. He died just this year in Florida at the age of 99. Unfortunately Peter was unable to attend his funeral in Florida due to his arrest, nor the memorial his uncle held for "Poppa" here in Connecticut in September. Our extended family also includes my late wifes brothers and sister and their kids along with her cousins. We all like each other, are constantly in touch with each other and get together frequently. Peter was very close to his late mother, going back to those early difficult years when she spent so much one-on-one time with him. When she died suddenly in April 2004, Peter took it very hard, as we all did, but perhaps more so. But the family closed ranks and together we got through the grief.

Over the years the immediate family has grown to where there are now 10 grandchildren. Peter has 5 nephews and 5 nieces, ranging in age from 21 years down to 2 years. With the cousins kids there are ten more children. He has watched them all grow and been an active participant in many, many family gatherings with the children involved, without the slightest hint of any abnormal interest or behavior relative to children. That is why it is so hard for me to understand why Peter did what he did. It is so out of character of the Peter I know. Even Peter can't explain it. He is so ashamed and embarassed that it took a long time for him to bring himself to tell all of his siblings what has happened. Just recently he revealed that while at a summer camp when he was 13, he was molested by one of the counselors. We never knew. He kept this dark secret to himself for over 30 years. It took this event to bring it out into the open.

Peter cannot and would not harm a child. It is not in his nature to do so. He has not initiated any contact with a child on the internet or through any other means. He did download child pornography on his computer via the internet, but that is the extent of it. This was terribly wrong and he knows it and has admitted it. He certainly was unaware, as was I, that this was a federal crime. Why did he do it ? I cannot explain, and I doubt Peter can either. It was some morbid phase he went through and having been exposed, he is totally humiliated and ashamed. This ordeal since his arrest has caused him untold anguish, and the loss of his job because of it was devastating. He now understands the seriousness of the offense of which he is charged and the necessity of law enforcement to do all it can to protect children from sexual predators and pedophiles who would harm them. He has not crossed that line and never will, but now he nows why these kind of actions are unlawful and require strict enforcement. He is scared to death of what might happen to him, and I hope and pray he gets the leniency he deserves.

10/8/07

October 10, 2007

To Honorable Karas,

My name is Janet Kirtman and I am writing this letter on Peter Carroll's behalf. I have known Pete for over 11 years. We first met at work at Pace University. We were in a meeting for the building of the University's new Midtown Center. I was the Assistant Director in charge of the new facility. Pete worked for our technology division and was assigned to design the University's first video conference room on this campus.

I got to know Pete on both a professional and personal level. From our first meeting we began a professional relationship which eventually moved to a great friendship to eventually falling in love with each other.

On the professional level Pete has always been professional. He is very detailed oriented and considered both the faculty and students in his classroom designs. Pete was designated as the person to design all technology to be used in all classrooms. His designs are still are still being used today. Pete was always concerned about the learning environment at the University. He was obsessed to the point that he was a work alcoholic. Pete had a reputation through out the University that if you needed technology for your classroom or special events that he was the person to contact. If the technology requested did not exist at the time he would research the technology and create it to fit the request. Over the years he has design video conference rooms to the C-Span classroom to computer servers to computer playing piano as a tribute to a donor (Eddie Layton) to the University. Pete also designed the "Media Patch Program for the University's libraries and it won the ALA/Information Today, Inc. Library of the Future Award. Only one other university won that award and that was Yale University. He also spent numerous hours (overtime) and weekends designing software for faculty members to web stream course work for our online courses. Most of these projects he designed he spent his own money because of his dedication to the University. We have had discussions on numerous occasions that he does not own the University and he should not have to spend his own money to accomplish a goal. Over past several years the University has been in a budget crisis but, he felt that if he did not do this no one would and the students and faculty would be on the losing end of learning experience. He felt that the most up to date technology should be available and it was his personal job to provide that for everyone at the University at his own expense both financially and personally.

On the personal level I got to know him through his work and his interests. We bonded over our love of music, plays, movies and memorabilia. We did not agree on my love of travel. I would have to twist his arm to get him to go on vacation. He never took all his vacation days for the years. Pete was always concerned about work and felt he should always be at the University because if someone needed him he wanted to available. When I finally convinced him to go on family vacations with my family he really became to love them and look forward to them every year. My cousins would get together twice

a year for one group trip to Disney in Florida and a trip to Rhode Island for lobster fest. He became part of the family and is loved by them all. He did not attend our last vacation at the end of July to Rhode Island because of this incident. I told everyone he was with his father but they all missed him and kept reminding me of that each day. I have seen him with my nieces and nephews and his nieces and nephews and never thought anything about their relationship except that he had more patience then me at times and was loving and caring and protective of them all. We all trusted each other with the safety of the children. On one family vacation in Florida we were visiting my parents. My sister and I had to get our parents to sign paper work for FEMA. (Background information my parent's condominium was destroyed by hurricane Wilma in 2005 and I was their main contact with FEMA and the insurance company.) My sister was watching our niece since my nephew and his parents were sleeping late and we both needed to go to my parents but did not want to take her with us. We left Pete and another cousin to watch her until we got back. When we returned she told us Pete watched her play with her toys and took her back to her parents to go potty and her brother was still sleeping so she returned to stay with Pete. Everyone trusted Pete to protect her and keep her safe. When we all go on family vacations all the adults look out for all the children on the trips. We are very over protective of the children and look out for each other.

Pete was and still is a very loving and caring man who never got his priorities straight. Pete sacrificed important family events because of his obsession with work and doing what he believed was beneficial to the learning experience at the University. He did support me emotionally for over two years while I was trying to get my parents home rebuilt in Florida while I was in New York. I was the direct contact with FEMA and their insurance company. My parents appointed me their representative since they did not understand the policies and procedures of both organizations. Pete was very understanding and patient with me as always. He assisted in the various moves from their home to storage facilities to temporary housing and then back home again. He put up with my priority shift from us to my parents. I guess it was easy for him since he was working most of the time.

I guess I should explain our relationship. Most of my adult life I have taken care of one family member or another without thinking about myself. Marriage or a permanent relationship was never in picture. As I tell Pete all the time he came along in my life when my guard was down and I needed a friend at that time. He stayed with me through the good and bad times in my life and I did the same for him. Our friendship is something I depend on and need in my life. I never thought I would have a friend I would grow to love and from that relationship I believe I know Pete very well. I feel in my heart that is no threat to anyone. He is very kind and loving man and the only person I have ever seen him hurt is himself. Pete has issues from his childhood that has colored the way he sees himself. He has low self esteem and doubts his intelligence and his talent. When he completes a project he is own worst critic and over the years I have tried to change his outlook. I have tried to explain to him that if he does this to himself then he sets himself up for others to come to same conclusion. He is good man and has never done anything to me or my family or his that would have made think twice about him.

I will always be there for him and support him the way he has supported me over the years.

Sincerely,

Janet Kirtman